
# SUPREME COURT OF ARKANSAS

No. CR-98-657

| | |
|---|---|
| BRUCE EARL WARD | **Opinion Delivered** February 26, 2015 |
| PETITIONER | |
| | MOTION TO RECALL THE |
| V. | MANDATE [PULASKI COUNTY |
| | CIRCUIT COURT, SEVENTH |
| | DIVISION, NO. CR-89-1836] |
| STATE OF ARKANSAS | |
| RESPONDENT | |
| | <u>MOTION DENIED</u>. |

**KAREN R. BAKER, Associate Justice**

This is a death penalty case with a long history before this court. The facts of Ward's

underlying case are as follows:

> On August 11, 1989, Little Rock Police Sergeant Michael Middleton was patrolling the area near the Jackpot convenience store on Rodney Parham Drive. Upon pulling into the parking lot, he noticed that the store's clerk was not at her normal work station. He then went into the store to try and locate the clerk. After he had looked through the store and was unable to find the clerk, Middleton called other officers to assist in the search. In the meantime, Middleton began to check outside the store, near the restrooms. He observed Ward walking from the restrooms toward a motorcycle that was parked nearby. Middleton spoke to Ward and told him that he was looking for the store's clerk. Ward told the officer that the clerk was inside the store, stocking. Ward stated that he had just had a cup of hot chocolate with the clerk and that she had given him the key to the restroom. Moments later, Sergeant Scott Timmons discovered [Rebecca] Doss's body lying on the floor of the men's restroom. She had been strangled to death. Ward was arrested and subsequently convicted of the murder.

*Ward v. State*, 338 Ark. 619, 622, 1 S.W.3d 1, 3 (1999)(*Ward III*).

In *Ward v. State*, 308 Ark. 415, 827 S.W.2d 110 (1992) (*Ward I*), we affirmed Ward's

SLIP OPINION

capital murder conviction for the death of Rebecca Doss at Jackpot Convenience Store in Little Rock on August 11, 1989. In *Ward I*, although we affirmed Ward's conviction, we reversed and remanded for resentencing based on an evidentiary error. Upon remand, Ward was again sentenced to death. However, we reversed and remanded his sentence again because a transcript of the record from the second sentencing was incomplete. *Ward v. State*, 321 Ark. 659, 906 S.W.2d 685 (1995) (*Ward II*) (per curiam). At his 1997 sentencing, Ward was sentenced to death for a third time. We affirmed his sentence on appeal in *Ward III*. Ward next filed a petition for postconviction relief under Ark. R. Crim. P. 37.5. We affirmed the circuit court's denial of that petition in *Ward v. State*, 350 Ark. 69, 84 S.W.3d 863 (2002)(*Ward IV*). On July 16, 2010, Ward filed a petition to reinvest jurisdiction in circuit court to consider a petition for a writ of error coram nobis. On September 30, 2010, we denied Ward's petition in his companion case, CR–91–36.

On April 12, 2013, Ward filed a motion to recall the mandate from his 1997 sentencing. The State timely responded and Ward timely replied. On May 23, 2013, we took the motion as a case. Because this case involves a sentence of death, jurisdiction is properly in this court pursuant to Arkansas Supreme Court Rule 1–2(a)(2).

Before the court is Ward's motion to recall the mandate on his 1997 sentencing in *Ward III*. In his motion, Ward presents two points: (1) this court should recall its mandate in Ward's 1997 sentencing because this court failed to notice, and appellate counsel ineffectively failed to raise, an obvious constitutional error under *Ake v. Oklahoma*, 470 U.S. 68 (1985), on the face of the record demonstrating that Ward was denied the aid of an

2

independent mental-health expert despite serious questions about his competence to stand trial; and (2) this court should recall its mandate because it failed to notice, and appellate counsel ineffectively failed to raise, the "at-the-time-of-the-murder" instruction regarding mitigation evidence, as a violation of the Eighth Amendment.

"The power of an appellate court to recall its mandate, if the circumstances warrant it, is recognized both in federal courts and state courts across the country." *Robbins v. State*, 353 Ark. 556, 563, 114 S.W.3d 217, 221 (2003) (internal citations omitted). This court will recall a mandate and reopen a case only in extraordinary circumstances. *Id.* In *Nooner v. State*, 2014 Ark. 296, 7-8, 438 S.W.3d 233, 239, we explained our standard for recalling a mandate:

> [O]ur decision in *Robbins* is patently clear that recall of our mandate is an extremely narrow remedy. Indeed, we stated in *Robbins* that recall of our mandate is to be granted only in extraordinary circumstances as a last resort to "avoid a miscarriage of justice" or "to protect the integrity of the judicial process." *See Robbins*, 353 Ark. [556, 563],114 S.W.3d [217, 222 (2003)](quoting *Calderon v. Thompson*, 523 U.S. 538, 558, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998), and *Demjanjuk v. Petrovsky*, 10 F.3d 338, 357 (6th Cir.1993)).
>
> Regardless of any inconsistencies in our decisions concerning the mandatory satisfaction of the three *Robbins*[1] factors, what has remained consistent in these cases has been a discussion of the three *Robbins* factors and this court's overarching concern that we will reopen a case only to address an "error in the appellate process," meaning an error that this court made or overlooked while reviewing a case in which the death sentence was imposed. *See, e.g., Engram v. State*, 360 Ark. 140, 147, 148, 200 S.W.3d

---

[1]In *Robbins*, we recalled the mandate because (1) Robbins cited to a decision "on all fours legally" with the issue presented, (2) federal court proceedings had been dismissed because of an unexhausted state-court claim, and (3) it was a death-penalty case, which required heightened scrutiny. *Robbins* 353 Ark. at 564, 114 S.W.3d at 222–23. In making that decision, we noted that there were unique circumstances that made the case "one of a kind, not to be repeated." *Id.*, 114 S.W.3d at 223.

367, 369, 370 (2004) (observing that the purpose of recalling the mandate in *Robbins* was to "correct an error in the appellate process" and emphasizing that "the *Robbins* case hinged on the fact that an error was made during this court's review, and the recall of the mandate was intended to give this court an opportunity to address an issue it should have addressed before"). We have also been consistent in considering motions to recall mandates in criminal cases only where the death penalty has been imposed. *See*, *e.g.*, *Maxwell v. State*, 2012 Ark. 251, 2012 WL 1950253 (per curiam).

*Nooner*, 2014 Ark. 296, at 8–9, 438 S.W.3d at 239.

Accordingly, circumstances requiring this court to recall a mandate occur in extremely limited circumstances.

## I. *Ake v. Oklahoma*

With this standard identified, we turn to Ward's request that this court recall the mandate of his 1997 sentencing. Ward first asserts that there was a defect or a breakdown in the proceedings because this court failed to notice and appellate counsel failed to raise obvious error under *Ake*. As a result, Ward contends that he was denied his constitutional right to psychiatric assistance and tried while mentally incompetent.

Specifically, Ward asserts that the trial court committed fundamental error by refusing to grant Ward's request for the assistance of an independent mental–health expert, who would have concluded that Ward was incompetent to proceed. Ward contends that the record demonstrates that Ward's behavior at the time of his 1997 sentencing demonstrates that Ward did not understand the proceedings, that he was incapable of meaningfully assisting counsel in defending him, and the circuit court did not adequately explore Ward's competence at the time. Ward further asserts that "counsel repeatedly sought funding for an independent mental health expert as required by *Ake*, both for purposes of assessing Mr. Ward's sanity and

4

competence for trial, as well as to develop mitigating evidence for sentencing." For support, Ward cites to his *Ake* motion, his motion to stay proceedings, and affidavits of his counsel that stated Ward's mental condition had deteriorated, pointing to specific examples of Ward's behavior and his counsel's statement stated that she was "sincerely concerned that he was not competent to proceed." Further, Ward relies on a 2008 evaluation from forensic psychiatrist, William S. Logan, M.D., who examined Ward, consulted with counsel, and concluded that Ward suffers from schizophrenia. Relying on these, Ward contends that the denial of his *Ake* motion constituted a fundamental breakdown in the appellate process and this court should recall the mandate of Ward's 1997 sentencing.

Finally, Ward contends that the exam conducted at the Arkansas State Hospital before his 1997 sentencing, where he was found to be competent, was not an adequate examination because Ward was uncooperative, the exams and opinions were formed without knowing the "odd statements" Ward had made to his counsel, and the exam also did not account for Ward's social history. Ward asserts that due process required that Ward should have been provided with an independent mental health expert. Noting that this court has held that a state hospital examination ordinarily satisfies *Ake*, Ward contends that the weight of persuasive authority requires that an independent mental–health expert be appointed.

The State responds that Ward's arguments are without merit and were previously addressed and rejected by this court in Ward's petition seeking reinvestiture in the circuit court to consider a petition for error coram nobis. The State further responds that before his 1997 sentencing, Ward was referred to the state hospital for evaluation but that he refused to

be examined. Additionally, despite his refusal to cooperate, the State contends that Dr. Michael Simon, a forensic psychologist who examined Ward at the state hospital, noted that there was no sign of an Axis I disorder and that Ward interacted in a logical, coherent manner and exhibited no signs of psychosis.

Further, the State responds that Logan's findings must be viewed with great suspicion as they are based on examining Ward on one occasion, eighteen years after his trial, and close to ten years after the resentencing at issue. The State contends that Ward has been before courts since 1989 and no serious issue concerning his mental competence has ever been found to be meritorious, and that there is simply no breakdown in the appellate process.

Turning to the applicable law, in *Ake*, the United States Supreme Court held that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, due process requires that a state provide access to a psychiatrist's assistance on this issue, if a defendant cannot otherwise afford one. *Ake*, 470 U.S. at 74. The Supreme Court held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel we leave to the State the decision on how to implement this right.

*Ake*, 470 U.S. at 83.

We have applied the holding from *Ake* many times and have explained:

SLIP OPINION

In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court held that where an indigent defendant makes a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the State must provide access to a psychiatrist's assistance on the issue if the defendant cannot afford one. Ark. Code Ann. § 5-2-305 (Repl. 2006) provides the statutory procedures to be followed when the defense of mental disease or defect is raised, and in *Dirickson v. State*, 329 Ark. 572, 576–77, 953 S.W.2d 55, 57 (1997), we addressed *Ake* and § 5-2-305, stating the following:

> We have repeatedly held that a defendant's right to examination under *Ake* is protected by an examination by the state hospital as provided by this statute. An evaluation performed under this section does not normally require a second opinion, and further evaluation is discretionary with the trial court. Stated simply, the State is not required to pay for a defendant to shop from doctor to doctor until he finds one who will declare him incompetent to proceed with his trial. In the present case, appellant was examined at the state hospital, and, thus, the requirements under *Ake* were satisfied.

*Creed v. State*, 372 Ark. 221, 223-24, 273 S.W.3d 494, 497 (2008).

In other words, pursuant to *Ake*, Ward must make a threshold showing that his sanity is likely to be a significant factor in his defense. This determination is made on a case by case basis. *See Pyland v. State*, 302 Ark. 444, 790 S.W.2d 178 (1990).

With these requirements in mind, we turn to the facts of Ward's case. At the time of his 1997 sentencing, Ward must have made the threshold showing that his sanity at the time of the offense would be a significant issue and an error occurred in this court's review that requires us to recall the mandate in *Ward III*. The record demonstrates that on February 14, 1997, Ward filed a motion for appropriation of funds for expert assistance pursuant to *Ake*. In Ward's motion, he stated in pertinent part:

> Mr. Ward requests an ex parte hearing on this motion under the authority of <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985). This request is made because defense counsel does not wish to unnecessarily disclose the defense mitigation case.

7

The reasons in support of this motion are set out in the accompanying memorandum.

. . . .

Counsel for Mr. Ward represents to the Court that she has probable cause to suspect that the utilization of these particular experts will produce mitigating evidence. It is the professional judgment of defense counsel that this information is necessary in order to adequately represent Mr. Ward and that these steps would most certainly be undertaken in the course of representation provided to a similarly situated client in a retained counsel case.

On February 27, 1997, the circuit court denied the *Ake* motion. At the pretrial hearing, Ward stated several times that he was not interested in resentencing and wanted to be released from prison or reinstate the death penalty. Additionally, Ward refused to cooperate in 1996 with the state hospital for a mental evaluation. On October 7, 1997, pursuant to both parties' request, the circuit court ordered Ward to undergo an Act III evaluation. On October 17, 1997, Michael Simon, Ph.D., a forensic psychologist, attempted to conduct an evaluation of Ward and submitted a report to the circuit court on that same date. The evaluation stated in pertinent part:

On 10/17/97, a forensic evaluation team consisting of Wendell Hall, MD., Michael I. Simon, PhD., and Marla Gergely, L.C.S.W. made an attempt to evaluate Mr. Ward. He was brought to a conference room to meet with the evaluation team at the Arkansas State Hospital. He was neatly dressed in an, orange jumpsuit. He began the interview by stating, "I cannot comply with the evaluation," He did say his attorneys filed a motion for evaluation and he tried to remove their motion. The court denied them and ordered him to appear for evaluation. He politely informed us "I am competent". . . "I have a right to remain silent," . . . "I am not going to submit to evaluation." At this point the evaluation was terminated. Thus, in summary, the evaluation could not be completed due to Mr. Ward's unwillingness to participate. There was no evidence to indicate that this unwillingness was due to mental disease or defect. During our brief interview with Mr. Ward, he interacted in a logical, coherent manner and exhibited no signs of psychosis. Thus, in summary, Mr. Ward refused to cooperate with this evaluation and there was no indication that this uncooperativeness was due to any Axis I mental disorder.

8

SLIP OPINION

At Ward's 1997 resentencing trial, Ward presented several witnesses through video-taped statements. Ward presented testimony of three educators from the Erie, Pennsylvania school system where he attended school. Thomas Ritter, a teacher and guidance counselor, testified that he taught Ward in 1965 and 1966 and was also his guidance counselor in the 1970s. Ritter testified that Ward did not have success in school and that Ward was disruptive, and without provocation was aggressive toward other students, but when Ritter spoke to Ward about this behavior he had a "blank stare . . . there was no comprehension that he did anything wrong." Ritter further testified that he knew something "was basically wrong" with Ward but that he did not refer him to a psychologist because at that time the school system had very limited access to psychologists and based on Ward's testing he had the ability to learn. Ritter also testified that Ward exhibited "hostile behavior . . . bizarre behavior."

L. Catherine Fayenmeyer, a guidance counselor in Wattsburg, Pennsylvania from 1965 to 1975, testified that she met with Ward ten to twelve times over a five-year period and knew Ward well. She testified that Ward came to see her mainly for disciplinary problems. She further testified that Ward did not put forth effort in school and was disruptive in class. Fayenmeyer testified that Ward was very bright but had very few friends and did not engage in any activities at school. She testified that Ward was "exceptional" because he did not need classes for "dull students," but she opined that the opportunity to work one on one with a teacher would have made a significant difference for him.

C.J. Wortham, an education specialist in the City of Erie, Pennsylvania in the 1960s and 1970s and who was also part of the Civil Air Patrol Program, worked with Ward for

approximately a year and a half when Ward was a cadet in the program. Wortham testified that Ward did well in the structured Civil Air Patrol program and was good with outdoor work and compassing. He also testified that Ward was good with adults, but had emotional problems dealing with his peers and life in general. Wortham testified that he recommended to Ward's family that they seek psychiatric help for Ward. He also testified that Ward got "into trouble" when alcohol was present.

Next, the deposition of Dr. Anthony Cillufo, a psychologist, was read into the record as part of Ward's 1997 sentencing.[2] Dr. Cillufo testified that on April 22, 1977, he conducted a three-hour interview of Ward at the Erie County jail. He testified that he conducted a battery of tests and an extensive clinical interview with Ward, including talking with Ward about his life history, family relationships, and sexual history. Dr. Cillufo diagnosed Ward as an anxious, shy, alienated man of average intelligence, with a propensity for acting violently as part of a mixed personality disorder. He further testified that Ward had features of social personality or explosive personality as well as passive/aggressive and paranoid disorders, and a secondary diagnosis of alcoholism. Further, Dr. Cillufo testified that Ward could possibly have had some early history of minimal brain dysfunction and a slight possibility of neurological damage as Ward had reported fainting spells or blackouts. Dr. Cillufo testified that his main diagnosis was mixed personality disorder.

Ward also presented testimony from Tom Devine, an attorney at the Pulaski County

---

[2]We also note that Dr. Cillufo's deposition testimony was also read into the record during Ward's second resentencing hearing.

SLIP OPINION

Public Defender's Office. Devine testified that he had known Ward for twelve and a half years and Ward made paintings and drawings for him.

Gary Wayne Brossett had testified at Ward's first trial, and his testimony was also read into the record during Ward's 1997 sentencing. Brossett testified that he was a nursing student at Arkansas Children's Hospital in 1989 and was working at Joubert's, a local tavern. Brossett testified that Ward was at Joubert's on the night of Doss's murder and that Ward drank a few beers and played some pool and left the tavern around midnight.

Having reviewed Ward's presentation of evidence at the 1997 sentencing, we turn to Ward's argument in his motion to recall the mandate regarding an alleged *Ake* violation. In asserting that this court should recall the mandate on this point, Ward relies primarily on a report from Dr. William Logan, a forensic psychiatrist. Logan's forty-one-page report regarding Ward's 1997 sentencing can be summarized as follows. Logan diagnosed Ward with "schizophrenia, paranoid type, as evidenced by a preoccupation with persecutory and grandiose delusional ideas, and occasional hallucinations and disorganized thinking." Dr. Logan examined Ward on October 22, 2008. Dr. Logan completed a three-hour examination on Ward at the Varner Supermax Unit. According to his report, Dr. Logan reviewed IQ evaluations performed on Ward in 1972, a presentence report performed in 1977, several documents compiled in connection with Ward's prior arrest in Pennsylvania in 1977, Ward's military records, a questionnaire completed by Ward's mother in 1977, Ward's medical history compiled after his 1989 arrest in Arkansas, evaluations performed by Dr. Simon, affidavits from Ward's prior counsel describing his behavior during his 1990 trial and

11

two resentencing hearings, Ward's competency hearing, and various filings and pleadings made by both the State and Ward during his trial and sentencing hearings.

In his report, Dr. Logan described Ward as a heavyset man with poor grooming. He described Ward as having "fair thought organization when giving information about his family and childhood," but noted that "[a]s he began to discuss his legal situation his thought processes deteriorated markedly." Dr. Logan described Ward's "persistent and grandiose delusions" that he "was the target of a conspiracy between officials in Pennsylvania, someone he knew in Canton, Texas and various Arkansas government entities including the governor's office and the State and Federal Public Defenders." According to Dr. Logan, Ward's delusions "do not compromise his intellectual capacity in terms of his intelligence and orientation," but that his understanding of his conviction and sentence are "irrational and delusional." For example, Dr. Logan stated that Ward expressed his belief that "he will never be executed, but rather be exonerated and leave prison a free man to achieve great success." According to Dr. Logan, Ward attributes this belief to "revelations from God."

Dr. Logan's report also described delusions reported by Ward, including his belief that Joe Biden "got Nick Trenticosta (a former attorney of Mr. Ward's) on his case and also has a connection to his current attorney." Ward also reported that he "can see the future including future disasters and future events." He also believes his father is part of the Illuminati and that the Illuminati are trying to help him. According to Dr. Logan's report, Ward described visions of a large black dog that jumps into people and possesses them and that Ward reported hearing his deceased father's voice from a chair. Ward also described his

belief that others are jealous of him because of his talent and power and that some of the other prisoners are demons under a spell from the State because they do not complain. Ward stated that he "also has been the victim of a laxative curse." During the interview, Ward reported that the "unholy Alliance in Pennsylvania told him to give up his powers or suffer the consequences."

Dr. Logan diagnosed Ward as having schizophrenia, paranoid type. Dr. Logan gave his opinion that Ward was not competent to be executed. Dr. Logan's specific report regarding the 1997 sentencing was as follows:

### Competency to Stand Trial in the 1997 Penalty Phase Hearing

Mr. Ward adamantly opposed any attempt by his then attorney, Ms. Tammy Harris to present mitigation testimony that might result in a life sentence. He resisted an effort to assess his competency. Mr. Ward's decisional competency was never addressed. He wanted an outright dismissal of the charges and compensation. Despite his bizarre behavior, the case was allowed to proceed. Subsequently, it has been revealed Mr. Ward's actions were the direct consequences of delusional beliefs that resulted from his Paranoid Schizophrenia, a mental disease.

Consequently, it is my opinion with a reasonable degree of medical certainty that at the 1997 Penalty Phase proceeding, Mr. Ward suffered from Paranoid Schizophrenia. It is my further opinion that the delusions characteristic of this mental disease prevented him from having an ability to understand rationally the proceedings against him and from having the ability to assist effectively in his own defense.

In reviewing Dr. Logan's report, we note that Dr. Logan's evaluation was performed in 2008 and was not part of the record in Ward's 1997 sentencing. Further, Dr. Logan's report discrediting years of data and evaluation is based on his one visit with Ward in 2008. In any event, Dr. Logan's report is of limited support for Ward's argument that a fundamental breakdown in the appellate process occurred in Ward's 1997 sentencing regarding Ward's *Ake*

SLIP OPINION

argument because it was not part of the record reviewed by this court.

Next, the record demonstrates that on October 17, 1997, Ward was afforded the opportunity to have his "competency and criminal responsibility" evaluated by psychologists at the state hospital. Although Ward was unwilling to participate, Dr. Simon reported that "there was no evidence to indicate that this unwillingness was due to mental disease or defect." Ward asserts that this evaluation is unreliable and he should be afforded an independent evaluation. However, we have recognized that a defendant's rights are adequately protected by an examination at the state hospital, an institution that has no part in the prosecution of criminals. *Branscomb v. State*, 299 Ark. 482, 774 S.W.2d 426 (1989); *Dunn v. State*, 291 Ark. 131, 722 S.W.2d 595 (1987); *Wall v. State*, 289 Ark. 570, 715 S.W.2d 208 (1986). In other words, the defendant does not have a constitutional right to search for a psychiatrist of his personal liking or to receive funds to hire his own but is entitled to access to a competent psychiatrist and the examination afforded to Ward satisfied that right. Although Ward requests that we overrule our precedent holding that a competency evaluation at the Arkansas State Hospital satisfies *Ake*, we decline to overrule this precedent.

In sum, we do not find merit in Ward's assertions. Whether Ward contends that he was not competent to stand trial at the 1997 sentencing or that his sanity at the time of the offense was at issue, based on the record before us, we do not find that there was a breakdown in the appellate process in *Ward III*. Ward was afforded his constitutionally guaranteed evaluation pursuant to *Ake*, and the record does not support Ward's contention that any breakdown occurred. Ward simply failed to make a threshold showing that his sanity at the

14

time of the offense or his competence to stand trial were significant factors. While the record

demonstrates that Ward filed the *Ake* motion, Ward did not make an argument that the state

hospital evaluation was inadequate or present any evidence that would support his argument

that there was a breakdown in the appellate process. Likewise, we reject Ward's contention

that the circuit court's failure to provide an independent psychiatrist to develop mitigating

evidence during sentencing, and this court's subsequent failure to discover and reverse that

decision, resulted in a breakdown of the appellate process. Accordingly, we deny Ward's

request that we recall the mandate on his first point.

## II. *At-The-Time-of-The-Murder Instruction*

Next, Ward asserts that this court should recall the mandate of his 1997 sentencing

because the jury was erroneously instructed that it should weigh *only* the mitigating factors

that "existed at the time of the murder" in violation of the Eighth Amendment under *Penry*

*v. Lynaugh*, 492 U.S. 302 (1989), and *Skipper v. South Carolina*, 476 U.S. 1 (1986). Ward

contends that there is a reasonable likelihood that the jury understood the at-the-time-of-the-

murder instruction to preclude them from considering or giving effect to relevant mitigating

evidence, which violates *Penry*.

In Form 2 – Mitigating Circumstances, five mitigators were listed under each part, A,

B and C. Parts A and C include the at-the-time-of-the-murder language. Part B did not

include this language. The jury did not select any mitigators under Parts A and C. However,

on Part B the jury marked "one or more of the jury believe that the following mitigating

circumstance probably existed, but the jury did not unanimously agree." The jury selected

15

"that for years . . . Ward exhibited signs of mental or emotional disturbance or defect that went untreated." In sum, Ward argues that the jury's having marked this circumstance on Form B without the at-the-time-of-the-murder language and the prosecutor's argument that evidence of what had happened years before the offense was not relevant to sentencing resulted in reversible error. Ward contends that this language on the form likely caused some jurors to believe the State's argument that the evidence did not qualify as mitigating evidence because it was too old. Therefore, Ward asserts that the verdict forms prevented the jury from considering mitigating evidence, that error requires reversal and this court should recall its mandate because we failed to address this error in our review. Finally, Ward asserts without citation to authority that "although this court denied a similar Eighth Amendment challenge in *Thessing v. State*, 365 Ark. 384, 230 S.W.3d 526 (2006), that case is not controlling here. As the United States Supreme Court has made clear, the existence of a reasonable likelihood that an instruction precluded the jury from considering relevant mitigating evidence depends on the context-specific facts of the case."

The State responds that Ward's argument that the jury was precluded from considering past events from Ward's life is without merit. The State asserts that the jury was permitted to consider any factors that affected him at the time of the murder, including past experiences; evidence from his teachers, employers, medical opinions, and other experiences that occurred earlier in his life. We agree that the jury was able to consider all of that evidence and there is nothing to be remedied by recalling the mandate.

Although the parties do not address the issue of preservation, we note that Ward did

not present this issue in his direct appeal in *Ward III*. However, in *Nooner*, Nooner presented

the same argument regarding the "at-the-time-of-the-murder-instruction" for the first time

in his motion to recall the mandate and asserted that the error was so egregious that this court

should have sua sponte raised the issue. We disagreed and explained that

> United States Supreme Court precedent has long recognized that a sentencing jury must be able to give a " 'reasoned moral response' "to any relevant mitigating evidence when deciding to sentence a defendant to death.
>
> . . . .
>
> Nooner asserts that we should grant recall of the mandate in order to correct this court's failure to discover sua sponte on direct appeal the Eighth Amendment violation that he alleges occurred as a result of the "at-the-time-of-the-murder" restriction in the verdict form and in the prosecutor's closing arguments. The State responds that Nooner fails to establish any obligation on this court's part to have raised and considered this issue sua sponte on direct appeal, and, hence, fails to establish a defect in appellate proceedings to warrant recall of the mandate.
>
> We agree with the State that Nooner has not identified a reversible error that this court was obligated to raise sua sponte on his direct appeal; therefore, he has not demonstrated a breakdown in the appellate process required for the extraordinary circumstances that warrant recall of the mandate. First, based on Arkansas Supreme Court Rule 4-3(h) (1995), which was applicable to Nooner's direct appeal in 1995, the scope of our review of death-penalty cases was limited to rulings on objections decided adversely to him. This limited review presupposed a contemporaneous objection at trial. As previously noted, this court's mandatory review in death cases for prejudicial and egregious errors pursuant to Rule 10 is applicable only to cases in which a sentence of death has been imposed after August 1, 2001. *See Newman v. State*, 350 Ark. 51, 84 S.W.3d 443 (2002) (per curiam); *see also State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999). Second, this court has previously concluded that the "at-the-time-of-the-murder" language in the mitigating-circumstances instruction and special-verdict form did not raise an issue subject to review when raised for the first time on appeal under Rule 10 or even as an exception to the contemporaneous-objection rule pursuant to *Wicks*, 270 Ark. 781, 606 S.W.2d 366. *See Thessing v. State*, 365 Ark. 384, 230 S.W.3d 526 (2006) (concluding that a challenge to the "at-the-time-of-the-murder" language did not rise to the level of serious error or a matter essential for the jury's consideration of the death penalty).

Nooner concedes that this court denied a similar Eighth Amendment claim on the merits in *Thessing*, 365 Ark. 384, 230 S.W.3d 526, but contends that *Thessing* is not controlling here because "the United States Supreme Court has made clear [that], whether there is a reasonable likelihood that a challenged instruction precluded the jury from considering relevant mitigating evidence is decided in context, on a case-by-case basis, rather than as a per se matter."

*Nooner*, 2014 Ark. at 296, 438 S.W.3d at 246-47.

We disagreed with Nooner and ultimately held:

Under the foregoing facts, Nooner has not demonstrated a likelihood that the jury felt inhibited from considering the relevant mitigating evidence. We see a marked distinction between the instant case and the companion cases of *Brewer* [*v. Quarterman*, 550 U.S. 286 (2007)] and *Abdul–Kabir* [*v. Quarterman*, 550 U.S. 233 (2007)] on which Nooner relies. Those cases involved a refusal of the trial court to give any instruction on mitigating considerations. In comparison, Nooner has demonstrated, at best, only a possibility that the jury felt constrained by the "at-the-time-of-the-murder" instruction and argument. "[A] capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility" that the jury was inhibited from considering relevant mitigating evidence. *Boyde* [*v. California*, 494 U.S. at 370, 110 S.Ct. 1190 (1990)]. "There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation." *Id.*

Even assuming that *Thessing*, 365 Ark. 384, 230 S.W.3d 526, is not controlling on a per se basis, Nooner has not identified a breakdown in the appellate process to warrant a recall of his direct-appeal mandate.

*Nooner*, 2014 Ark. at 296, 438 S.W.3d at 248.

In *Thessing*, we explained that "the mere fact that the jurors in this case unanimously found only one mitigating factor to exist does not prove that the jury was confused or that it disregarded consideration of other mitigating circumstances." *Thessing*, 365 Ark. at 409, 230 S.W.3d at 545.

We find Ward's contentions that *Thessing* is distinguishable from his case unconvincing.

18

SLIP OPINION

In *Thessing*, Thessing made the same argument regarding the forms – and the past and future events – and this caused such confusion to the jury that it fell within our *Wicks* exceptions and was a constitutional violation. We rejected that argument and held that the discrepancy in verdict forms argued by Thessing did not rise to the level of serious error or a matter essential for the jury's consideration. Here, as in *Thessing*, the record fails to demonstrate that the jury was confused or misled by the forms. The evidence was admitted and the jury was not instructed to disregard it or otherwise prevented from considering the evidence. Accordingly, a review of the record demonstrates that a breakdown in the appellate process did not occur. Therefore, we deny the motion to recall the 1997 sentencing mandate on this second point.

Motion denied.

*Jennifer Horan*, Federal Defender, by: *Josh Lee*; and *Joseph W. Luby*, Death Penalty Litigation Clinic, for petitioner.

*Dustin McDaniel*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for respondent.