II. Standard of Review in Motion to Recall the Mandate
This court has the inherent power to recall its mandate but will exercise that power only in the most "extraordinary circumstances" to be used as a last resort to address "grave, unforeseen contingencies." Ward v. State , 2015 Ark. 61, at 3, 455 S.W.3d 818, 820 ; Nooner v. State , 2014 Ark. 296, at 9, 438 S.W.3d 233, 240 (citing Calderon v. Thompson , 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) ). To establish the extraordinary circumstances required, we have enumerated certain factors we consider, namely: (1) the presence *569 of a defect in the appellate process, (2) a dismissal of proceedings in federal court because of unexhausted state-court claims, and (3) the appeal is a death case that requires heightened scrutiny. Wertz v. State , 2016 Ark. 249, at 5, 493 S.W.3d 772, 775. A defect in the appellate process is "an error alleged to have been made by this court during the course of its appellate review" of a death-penalty case. Nooner , 2014 Ark. 296, at 8, 438 S.W.3d at 239. Such an error is distinguished from one that "should have been raised to the trial court" and could not be "considered as falling within one of the so-called Wicks ... exceptions," or within our independent review of death cases pursuant to Rule 4-3 of the Arkansas Supreme Court Rules, and Rule 10 of the Arkansas Rules of Appellate Procedure-Criminal. Id. (quoting Engram v. State , 360 Ark. 140, 148-50, 200 S.W.3d 367, 370-72 (2004) ).
The factors are not necessarily to be strictly applied; rather, they serve as a guide in determining whether to recall a mandate. Wertz , 2016 Ark. 249, at 5, 493 S.W.3d at 775. This guide is particularly important because recalling the mandate is discretionary and applying the factors serves as "some means of an internal check on that discretion" to ensure against its arbitrary application. Nooner , 2014 Ark. 296, at 9, 438 S.W.3d at 240
III. Ake Requirements
In Ake v. Oklahoma , the Supreme Court held that when a defendant shows that his "sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83, 105 S.Ct. 1087. The Court specifically stated that a defendant is not constitutionally entitled "to choose a psychiatrist of his personal liking or to receive funds to hire his own," but left the decision up to the individual states on how to implement the right. Id. at 83, 105 S.Ct. 1087.
The Court recently revisited its holding in Ake in McWilliams v. Dunn , --- U.S. ----, 137 S.Ct. 1790, 198 L.Ed.2d 341 (2017), where it rejected Alabama's argument that it met the requirements of Ake when it provided a competent psychiatrist to evaluate the defendant. Id. at 1800. The Court explained that Ake requires more than just an evaluation but "access to a competent psychiatrist who will [also] ... assist in [the] evaluation , ... preparation , and ... presentation of the defense." Id. (quoting Ake , 470 U.S. at 83, 105 S.Ct. 1087 ). The Court specifically declined to answer whether "a State must provide an indigent defendant with a qualified mental health expert retained specifically for the defense team, not a neutral expert available to both parties" because Alabama did not meet the most basic requirements. McWilliams , 137 S.Ct. at 1799.
From Davis's motion, it is clear that his request to stay his execution was premised on the assumption that the Supreme Court would answer that question in McWilliams . See Davis v. State , 2017 Ark. 135, 2017 WL 1404354 (Womack, J., dissenting). Both parties in this case acknowledge that the Court did not answer the anticipated question; therefore, Ake and this court's precedent still govern. Davis wrongly argues that this court has always applied a flawed interpretation of Ake by holding that a mental examination at the state hospital is all a defendant is entitled to. He argues that we should recall the mandate because this court applied our flawed interpretation on his direct appeal.
IV. Ake's Application
This court has never held such. At the time of Davis's trial, *570 Ark. Code Ann. § 5-2-305 (Supp. 1989) stated that if the defendant files notice that he intends to rely on a defense of mental disease or the court has reason to expect that the defendant's mental fitness will be in question, then the court shall order a mental examination. The circuit court in this case ordered an examination to be performed by Dr. Jenkins and an additional examination by the psychiatrists at the state hospital. Both examinations concluded that Davis was competent to stand trial. Our court has consistently held that the medical experts available at the Arkansas State Hospital meet the requirements of Ake because they are not involved in the prosecution of criminals, not that a mental examination is all that is required once a defendant has made a preliminary showing that his mental state will be a "significant factor at trial." See, e.g., Creed v. State , 372 Ark. 221, 224, 273 S.W.3d 494, 497 (2008) ; Dirickson v. State , 329 Ark. 572, 576, 953 S.W.2d 55, 57 (1997) ; Branscomb v. State , 299 Ark. 482, 486, 774 S.W.2d 426, 428 1989). We recently upheld our interpretation of Ake in Ward v. State and explained that the constitution does not guarantee a defendant the right to "shop" around until he finds a psychiatrist that will declare him incompetent. Ward v. State , 2015 Ark. 61, at 14, 455 S.W.3d 818, 826 (quoting Creed , 372 Ark. at 223-24, 273 S.W.3d at 497 ). In short, Davis's interpretation of our caselaw is incorrect.
Regardless of our interpretation of Ake , Davis received at least the minimum due process required. First, it is undisputed that Davis received a mental examination under the statute. Second, while his first request for funds to hire an independent expert was denied, his new counsel, Tim Morris, filed another motion to hire an independent counselor to develop mitigating evidence. At the November 8 hearing on Davis's written motion, the circuit court held his motion under advisement because the report from the state hospital did not contain any findings regarding how Davis's hyperactivity issues may have affected his judgment. The court specifically gave Davis the opportunity to interview the examiners and return to court if the information they provided was insufficient. Both of his attorneys testified that the state mental-health experts were not helpful in aiding his defense, and Morris stated that he spent four to six hours interviewing each doctor from the state hospital and it was their opinion that there was no mitigating evidence. Morris, who was lead counsel, ultimately made the decision to proceed with Jenkins's testimony at trial because his testimony was more helpful than that of the state doctors. However, he admitted that even if he had obtained funds to hire an independent psychiatrist there was no indication that they would have reached a different result and there "wasn't any need to go further."
Despite both Morris's and Martin's testimony that the state doctors were unhelpful and unwilling to aid them in their defense, there is no evidence that they returned to court and asked for funds to hire their own expert. Rather, the record shows they made the strategic decision not to move forward with their motion because no matter who they talked to, they were not going to obtain an opinion substantially different than what they had already received. It was at this point that they decided to present Jenkins's testimony at trial, and Morris even admitted that Jenkins was a helpful and willing participant at trial. Jenkins testified extensively about Davis's hyperactivity disorder and stated that individuals who face this disorder are substantially more likely to have substance abuse problems, psychiatric difficulties, and future legal problems. He also testified that substance abuse leads to some stunting of emotional or judgmental maturity *571 and that such an individual may have difficulty conforming his actions to abide within the law. Notably, Davis raised this same argument in his federal habeas petition, where the Eighth Circuit Court of Appeals determined that Jenkins's detailed testimony met the requirements of Ake . Davis v. Norris , 423 F.3d 868, 877 (8th Cir. 2005).
In summary, Davis made the strategic decision to not pursue a partisan psychiatrist and proceeded with Jenkins's testimony at trial. Such a decision is not a "defect in the appellate process" that is attributable to this court upon its review. Noel v. State , 342 Ark. 35, 41, 26 S.W.3d 123, 127 (2000) (trial strategy, even improvident strategy, is not reversible error). While the U.S. Constitution guarantees a right to a competent psychiatrist, it does not guarantee a psychiatrist who will reach the medical conclusions the defense team desires. Therefore, there was no breakdown in the appellate process that would warrant recalling the mandate. Because Davis cannot prevail on the first factor to recall the mandate, there is no need to apply the remaining two. Nooner , 2014 Ark. 296, at 9, 438 S.W.3d at 239.
Motion to recall the mandate denied; stay of execution lifted.
Kemp, C.J., and Hart, J., concur.
Josephine linker Hart, Justice, concurring.
While I agree with the outcome of this case, I write separately because I cannot sign on to the majority's intimation that Arkansas has always correctly interpreted the requirements of Ake v. Oklahoma , 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Without parsing the details of the majority's opinion, it suffices to say that in my view, Arkansas case law has interpreted Ake to guarantee a defendant with less than what McWilliams v. Dunn , 582 U.S. ----, 137 S.Ct. 1790, 198 L.Ed.2d 341 (2017) confirms is actually required. I believe Arkansas's prior interpretation of Ake is similar to that of the Alabama Court of Appeals in McWilliams , which the United States Supreme Court declared was "plainly incorrect." 582 U.S. at ----, 137 S.Ct. at 1800. However, because of the unique factual circumstances of this case, I nonetheless join the result reached by the majority. In spite of Arkansas's prior flawed interpretation of Ake's requirements, Davis was not denied anything Ake affords him, according to current United States Supreme Court precedent.
Ake provides that when a defendant's sanity is likely to be a significant issue at trial, "the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Ake , 470 U.S. at 83, 105 S.Ct. 1087. In McWilliams , the United States Supreme Court reiterated that Ake's requirements are not limited to just an "examination"; "[r]ather, it requires the State to provide the defense with 'access to a competent psychiatrist who will conduct an appropriate [1] examination and assist in [2] evaluation , [3] preparation , and [4] presentation of the defense,' " notwithstanding this court's prior decisions suggesting otherwise. 582 U.S. at ----, 137 S.Ct. at 1800 (emphasis in original); see, e.g. , Creed v. State , 372 Ark. 221, 224, 273 S.W.3d 494, 497 (2008) (stating that "a defendant's right to examination under Ake is protected by an examination by the state hospital as provided by [ Ark. Code Ann. § 5-2-305 (Repl. 2006) ]";[2]
*572 Dirickson v. State , 329 Ark. 572, 576, 953 S.W.2d 55, 57 (1997) ("We have repeatedly held that a defendant's right to examination under Ake is protected by an examination by the state hospital as provided by [ Ark. Code Ann. § 5-2-305 (Repl. 1993) ]."), Branscomb v. State , 299 Ark. 482, 486, 774 S.W.2d 426, 428 (1989) ("Counsel on appeal acknowledges the position we have taken but contends that, given the facts of this case, we should reconsider it. We decline to do so.").
The relevant facts for purposes of this analysis are as follows. Before trial, Davis's mental-health history was reviewed both by Dr. Travis Jenkins at Ozark Guidance Center and by Drs. John Anderson and Wendell Hall at the Arkansas State Hospital. Dr. Jenkins conducted the initial examination to determine whether Davis was competent to stand trial and whether he was insane at the time of the offense. Dr. Jenkins opined that, while Davis's ADHD diagnosis could have contributed to the commission of the crime, there was nothing found in the examination warranting a conclusion that Davis was psychotic at the then-present time or at the time of the offense, or that he was incompetent to stand trial.
Davis then filed a motion for an additional psychiatric evaluation to explore what aspects of his mental health could serve as mitigation evidence for purposes of sentencing. The circuit court entered an order committing Davis to the state hospital, where Drs. Anderson and Hall conducted examinations of Davis. However, the order did not specifically direct the state hospital doctors to address whether Davis's mental-health history offered evidence of mitigation. The state doctors issued a 5-page report which concluded that Davis was not insane at the then-present time or at the time of the offense, although it did note diagnoses of antisocial personality disorder, psychoactive substance abuse, and alcohol abuse, and detailed Davis's history of learning disabilities, hyperactivity, troubled family relationships, and previous stretches of incarceration. The report did not address whether any aspects of Davis's mental health amounted to mitigation evidence for purposes of sentencing.
Davis then moved the circuit court to order that expert funds be provided so that Davis could hire an independent psychiatrist. In this motion, Davis argued that there was no doctor-patient confidentiality with the state psychiatrists and that he wished to explore potentially mitigating evidence presented by his mental-health history. The circuit court denied this motion. Subsequently, Davis filed a written motion again requesting funds to hire an independent psychiatric expert. The circuit court held a hearing on Davis's motion, at which the circuit court reviewed the report from the doctors at the state hospital and concluded that it contained no findings with respect to mitigation. The circuit court then directed Davis's counsel to return to the state hospital and meet with the doctors who examined Davis to determine whether there was mitigation evidence presented by Davis's mental-health history. The circuit court did not specifically deny Davis's request for funds to hire an independent psychiatrist but directed *573 Davis's counsel to return to court if the state doctors refused to cooperate.
Davis's counsel traveled to Little Rock where he met with Drs. Anderson and Hall for approximately four to six hours. In reviewing the testimony from Davis's counsel at Davis's Rule 37 hearing, it is unclear whether the state doctors were unwilling to assist Davis's counsel in translating Davis's mental health history into a defense strategy to show mitigation evidence, whether the state doctors simply felt that Davis's mental history offered no mitigating evidence at all, or whether the truth is somewhere in the middle. There is no testimony in the record to the effect that the state doctors were wholly unwilling to testify about their opinions at Davis's trial.
What is undisputed is that Davis's counsel decided not to rely on any testimony from the state doctors at trial, and that Davis's counsel did not return to the circuit court before trial with any report that the state doctors had refused to cooperate. Instead, Davis's counsel returned to Dr. Jenkins because in his initial report he had opined that Davis's ADHD diagnosis could have contributed to the commission of the crime. Dr. Jenkins agreed to testify at Davis's sentencing trial, and Davis's counsel later characterized Dr. Jenkins's participation as "cooperative," "helpful," and "sympathetic in regard to those factors that affected [Davis], the ADHD and child events, and he had an antisocial disorder." However, it does not appear that Dr. Jenkins re-examined Davis after the initial 75-minute competency examination he conducted several months prior, or that Dr. Jenkins participated in any sort of "wood-shedding session" with either of Davis's attorneys to develop a trial strategy. It also appears that Dr. Jenkins had not reviewed all of Davis's school and medical records before testifying.
I now turn to whether the participation of either Dr. Jenkins or the state doctors in this case adequately protected the rights indisputably guaranteed by Ake and McWilliams : "examination," "evaluation," "preparation," and "presentation." See Ake and McWilliams, supra . In my opinion, Dr. Jenkins's participation falls short of these requirements; if nothing else, Dr. Jenkins's participation does not satisfy the preparation requirement because he never met with Davis's attorneys to convert Davis's mental-health history into trial strategy. See McWilliams , 582 U.S. at ----, 137 S.Ct. at 1800-01 (opining that Ake's assistance requirements contemplate helping defense evaluate defendant's medical records, translating those data into legal strategy, helping defense prepare and present legal arguments, preparing questions for direct-examination of witnesses, etc.).
Before turning to the participation of the state doctors in this case, I pause to note that I am troubled by a glaring legal question implicated by these facts: whether Ake is satisfied when although Ake's requirements have been triggered, the state doctor, who is presumed to be neutral and unbiased toward either the defense or the prosecution, opines that the defendant's mental-health status presents no defense or mitigating evidence. It was anticipated that the Supreme Court would resolve this issue when it granted certiorari in McWilliams on the specific question of whether Ake established that a state must provide an indigent defendant with a mental-health expert retained specifically for the defense team, as opposed to a neutral expert available to both parties. However, the McWilliams Court did not reach this issue.
This leaves cases like Davis's in a difficult position. A defense attorney in this situation will have no meaningful way to *574 ensure the veracity of the expert's methodology or to rebut the expert's conclusions, nor will the record contain any information that would empower a reviewing appellate court to recognize any impropriety on the part of the expert if any such impropriety has actually occurred. However, as long as we accept the notion that Ake's requirements can be satisfied without utilizing a mental-health expert independent from the state hospital (a notion which this court has adhered to and which remains specifically unrebutted after McWilliams ), this scenario seems inevitable.
Thus, I turn to the participation of the state doctors in this case and whether that participation satisfied Ake's requirements. It seems apparent that the "examination" requirement was satisfied while Davis was committed at the state hospital; the real question relates to the three "assistance" requirements: evaluation , preparation , and presentation. The circuit court in this case explained to Davis's counsel that he should return to the court for assistance if the state doctors refused to cooperate with him. The testimony from Davis's Rule 37 hearing reflects that, after meeting with the state doctors for four to six hours and considering their opinions that Davis's mental-health history offered no mitigating evidence, Davis's counsel decided that there "wasn't any need to go further." Davis's counsel then went back to Dr. Jenkins because he had opined that Davis's ADHD diagnosis could have contributed to the commission of the crime. Davis's counsel did not return to the circuit court before trial for further assistance on this issue.
Overall, as it relates to Davis's interactions with the doctors at the state hospital, the record does not reflect that the circuit court deprived Davis of his rights under Ake and McWilliams . The record reflects that the state doctors examined Davis, evaluated their findings, and concluded that Davis's mental-health history offered no mitigating evidence. The state doctors spent several hours going over their opinions with Davis's counsel, and there is nothing in the record to suggest that the state doctors would not have been willing to present those opinions to the jury if Davis's counsel had asked them to do so. Davis's counsel did not rely on any further assistance from the state doctors, nor did he return to the circuit court before trial with a report that the state doctors' assistance had been inadequate; instead, Davis's counsel went back to Dr. Jenkins. Applying Ake and McWilliams , this can only be characterized as a tactical decision made by Davis's trial counsel, not a constitutional violation committed by the circuit court.
Kemp, C.J., joins.

This statute, which existed in some form since 1995 and was repealed in 2017, provided for an examination at the Arkansas State Hospital by a qualified psychiatrist or psychologist who would then issue a report to the court and to the parties. See Ark. Code Ann. § 5-2-305 (Repl. 1997), amended by Act of Apr. 1, 2011, No. 991, 2011 Ark. Acts 4188; Act of Mar. 26, 2013, No. 506, 2013 Ark. Acts 1924; (Repl. 2013 & Supp. 2017), repealed by Act of Mar. 13, 2017, No. 472, § 5, 2017 Ark. Acts 2217, 2219. The statute did not contain any provision specifically addressing Ake's "preparation" or "presentation" requirements. Id.